NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JEFFREY TODD WILSON,

        Plaintiff,

v.                                  Case No. 6:14-CV-1227-ORL-37KRS

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff Jeffrey Todd Wilson seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 10, 12, 13, and the parties' Joint Memorandum. Doc. No. 15.[1]

## PROCEDURAL HISTORY.

In 2011, Wilson filed applications for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, and under the Supplemental

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 14. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Revised Scheduling Order. *Id.* at 4.

Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq*. (sometimes referred to herein as the "Act"). He alleged that he became disabled on January 7, 2011. R. 185, 192.

After his applications were denied originally and on reconsideration, Wilson asked for a hearing before an Administrative Law Judge ("ALJ"). R. 93-94. An ALJ held a hearing on September 26, 2012. Wilson, accompanied by an attorney, testified at the hearing. R. 29-54. The ALJ held a supplemental hearing on January 14, 2013. Wilson, again accompanied by an attorney, Mark Capps, a vocational expert ("VE"), and Robert Karsh, M.D., a medical expert ("ME"), testified at the supplemental hearing. R. 583-605.

After considering the hearing testimony and the evidence in the record, the ALJ issued a decision on April 12, 2013. R. 12-22. The ALJ found that Wilson was insured under OASDI through September 30, 2015. R. 14. The ALJ concluded that Wilson had not engaged in substantial gainful activity since the alleged disability onset date. R. 14.

The ALJ found that Wilson had diabetes mellitus, inflammatory arthritis, disorders of the spine, and obesity, which were severe impairments. *Id.* The ALJ concluded that Wilson did not have an impairment or combination of impairments that met or equaled an impairment listed in SSA regulations. R. 15.

The ALJ concluded that Wilson had the residual functional capacity ("RFC") to perform light work, "except the claimant is able to lift 20 pounds frequently; sit 8 hours in an 8-hour workday; and stand and walk 4 hours in an 8-hour workday." *Id.* In reaching this conclusion, the ALJ gave great weight to the functional capacity assessments of Alvan Barber, M.D., an examining physician, and the ME only to the extent that their opinions were consistent with the

NOT FOR PUBLICATION

ALJ's RFC. R. 19. To the extent that these physicians' assessment were inconsistent with the ALJ's RFC, the ALJ gave the opinions little weight. R. 19.

The ALJ determined that Wilson could not perform his past relevant work as a carpenter and building maintenance repairer. R. 20. Based on the testimony of the VE, the ALJ concluded that Wilson could perform light, unskilled work available in the national economy, specifically ticket seller (DOT 211-467.010), warehouse checker (DOT 222.687-010), and small parts assembler (DOT 706.684-022). R. 21. Therefore, the ALJ concluded that Wilson was not disabled. *Id.*

Wilson requested review of the ALJ's decision by the Appeals Council. R. 7-8. On June 3, 2014, the Appeals Council found no reason to review the ALJ's decision. R. 1-6.

Wilson now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Wilson having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are generally adequately stated in the Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by

reference.  Accordingly, I will only summarize facts pertinent to the issues raised to protect Wilson's privacy to the extent possible.

Wilson was born in 1966.  R. 185.  He attended high school through the tenth grade in special classes.  R. 32.  He eventually obtained a GED.  R. 32.  At the time of the ALJ's original hearing, Wilson was 5'11" tall and weighed between 280 and 300 pounds.  R. 33.  He previously worked as a residential framing carpenter and in maintenance.  R. 34.

At the ALJ's hearing, Wilson complained of neck, back and leg pain.  R. 35.  He had constant migraine headaches lasting one to two hours.  It hurt to look up or look down.  R. 35.  His arms and hands sometimes were numb from the fingertips radiating to his shoulder.  He dropped things.  R. 36.  Back pain radiated from the middle of his back down his thighs.  R. 37.  He described the pain as a constant sharp pain at a level of 8 on a 10-point pain scale.  R. 37-38.  He took medication for pain, which eased his pain somewhat if he performed very little activity.  R. 37, 249.  He suffered no side effects from the medication.  R. 37.  He was also treated for gout and rheumatoid arthritis.  R. 38.  During gout or arthritis flares[2], his legs, ankles and feet swelled and he could not walk.  R. 46. It took about a week with use of medication for the swelling to subside.  R. 47.  He had no insurance or cash to pay for medical care.  R. 285, 380, 425.

Wilson was trying to lose weight.  R. 33, 40, 43.  He had changed his diet to reduce flares from gout.  R. 38-39.  As for exercise, he testified, "I walk, I try walking.  I try bending, squatting, everything to loosen up – [.]"  R. 40-41.  He took insulin for diabetes mellitus.  R. 43.

---

[2] Dr. Karsh testified that a flare "means that the joint is red and hot and painful and swollen and if you were to tap the joint you would find urate crystals in it."  R. 593.

4

Wilson estimated that he could sit or stand for about two hours before needing to move for a least thirty minutes. R. 45. He was able to walk up to a block. He could lift a gallon of milk. R. 45. He could drive an automobile. He could shop for groceries, but he used an electric cart when he had gout flares, which occurred about every four to six months. R. 48-49. He could make breakfast and lunch, and he could manage to do the laundry. R. 48.

Medical records show that Wilson has type II diabetes. R. 319. On June 11, 2011, a treatment note reflects that the diabetes was uncontrolled. R. 426.

Before the alleged disability onset date, Wilson was diagnosed with gouty arthropathy. R. 326. On April 22, 2011, Wilson sought emergency room treatment for pain in his left foot. R. 393. The treatment provider observed tenderness and swelling in the left ankle and foot. R. 394. The diagnoses were ankle and foot sprain, gout and degenerative joint disease. *Id.* He was treated with Keflex, Lortab and IndoCIN and released. R. 395.

On April 22, 2011, Wilson was examined by Darwin Caraballo, M.D., at the request of the Office of Disability Determinations. R. 380. Wilson complained of pain and discomfort in his hips, knees and ankles for the previous two years after falling backwards from a roof. He also reported severe gout attacks happening more frequently for the previous year. He could walk from the house to the mailbox and back, but it was painful and he used a cane for balance particularly during a gouty attack. R. 380. Upon examination, Dr. Caraballo observed the Wilson was morbidly obese, weighing 299 pounds. R. 381. Dr. Caraballo noted mild to moderate tenderness to palpation in the cervical spine and mild to moderate paraspinal muscle spasm throughout the spine. Straight-leg raising tests were positive for pain bilaterally. R. 381. In his upper extremities, Wilson's muscle strength was 5/5 with full range of motion. R. 382. His fine

manipulation was intact. In the lower extremities, Wilson had edema on the left knee and ankle with significantly decreased range of motion. Muscle strength was 5/5. Dr. Caraballo observed that Wilson walked with a limp due to a gouty attack and his gait was slow. He walked twenty-five steps. R. 382. Dr. Carballo's impressions were chronic musculoskeletal spasm and pain of the cervical, thoracic and lumbar spine area; chronic left knee and left ankle pain; gout, currently going through a gouty attack; and, morbid obesity. R. 382-83.

An emergency department treatment record from June 11, 2011 revealed that Wilson did not have lower extremity edema. R. 426. However, on June 12, 2011, he did have tenderness in the joints in his left ankle and left knee. R. 428.

Wilson again sought emergency department treatment on July 11, 2011 for foot and ankle swelling bilaterally for the previous three weeks. R. 511. Tenderness, swelling and erythema were noted on examination. R. 512. The treating professional's assessment was gout and uncontrolled diabetes. R. 514.

Wilson was treated in an emergency department on January 4, 2012 following a motor vehicle collision. R. 489. Upon examination, he had normal range of motion with no swelling. R. 490. Radiologic imaging showed degenerative disc disease at C5-C6. R. 494. Thereafter, he complained of headaches and neck and back pain. R. 517.

On January 16, 2012, John Ortolani, M.D., found on examination that Wilson had paracervical muscle tenderness and spasms, pain and spasm in the trapezius muscle on the left side, and parathoracic muscle tenderness and spasms with point tenderness from T6 through T12. R. 527, 527. He also observed paralumbar muscle tenderness and spasms. R. 527. Straight-leg raising tests were negative. R. 527. He prescribed Lortab. R. 528.

NOT FOR PUBLICATION

On January 28, 2012, Wilson was hospitalized when he complained of chest pain radiating down his left arm. R. 564. His blood sugar was high but stabilized with insulin. R. 565. A cardiac catheterization showed normal coronary arteries. The treating physician "discussed an aggressive risk factor modification program with strict cardiac diet and daily exercise for at least 30 minutes." *Id.* The record also reflects that Wilson was probably experiencing muscle spasms as a result of a recent motor vehicle accident. *Id.*

On April 10, 2012, Dr. Ortolani noted that MRI studies revealed a shear injury in Wilson's brain, an annular tear at C4-C5, disc bulges at C3-C4, C5-C6 and C6-C7, a herniated disc at L1-L2, and a tear at T7-T8. R. 517, 522-23. An EMG/NCV test revealed cervical radiculopathy at C6-C7 and lumbar radiculopathy at L5-S1 on the left. R. 517, 520. Dr. Ortolani observed on examination spasms in Wilson's neck and back with restriction of motion and pain radiating to the left lower extremities. R. 517. Dr. Ortolani noted that Wilson was able to tolerate Lortab without side effects. R. 517. His diagnoses were postconcussion syndrome, cervical radiculopathy and lumbar/thoracic radiculopathy. R. 519. He rated Wilson at a 19% impairment of the body as a whole due to the motor vehicle accident. R. 518.

Dr. Barber examined Wilson on May 16, 2012 at the request of the state Office of Disability Determinations. R. 457-65. Dr. Barber observed that Wilson could get on and off and lie flat on the examining table. R. 459. Wilson's weight was 288 pounds. R. 459. Wilson told Dr. Barber that he had gout flares when the weather was bad. R. 457-58. Physical examination of Wilson's upper extremities was normal. R. 461. Physical examination of the lower extremities showed numbness and tingling in the feet, greater on the left. Muscle strength was 5/5. *Id.* Dr. Barber observed mid/low paravertebral muscle spasms, positive tenderness in

NOT FOR PUBLICATION

the SI joint and a straight-leg raising test was positive for low back pain on the left.  R. 461. Wilson walked with a guarded gait.  R. 462.  He could not squat or walk on his toes or his heels. R. 462.

Dr. Barber prepared a functional capacity assessment supported by his findings on examination.  R. 463, 466-71 (part of Exhibit 12F).  He opined that Wilson could lift and carry up to twenty pounds frequently and up to fifty pounds occasionally.  R. 466.  Wilson could sit three hours at a time up to six hours in an eight-hour workday.  R. 467.  He could stand or walk each for two hours at a time up to a total of four hours each in an eight-hour workday.  He did not need a cane to walk.  R. 467.  He could occasionally climb stairs and ramps and kneel but never climb ladders or scaffolds, balance, stoop, crouch or crawl.  R. 469.  He could occasionally work around moving mechanical parts, operate a motor vehicle, and work in humidity and wetness and around vibrations.  R. 470.  He could never work at unprotected heights, around environmental irritants or in extreme temperatures.  He could tolerate moderate office noise.  R. 470.

Dr. Ortolani examined Wilson again on July 31, 2012.  *See* R. 536.  He noted increased spasms in Wilson's neck with restriction of motion, pain over the left cervical roots, spasms in the upper trapezius and levator muscles, pain throughout the cervical region, spasms in the low back and pain radiating down Wilson's left leg.  R. 536.  Dr. Ortolani wrote that Wilson could tolerate his current pain reliever.  R. 536.  On November 26, 2012, Dr. Ortolani noted, "Opioid analgesics have relieved this patient's pain and improved daily physical functioning and quality of life."  R. 580.

Dr. Karsh is board certified in internal medicine and rheumatology.  R. 133.  He testified, after review of Wilson's records, about Wilson's condition as of the disability onset date through

8

the date of the supplemental hearing. R. 585-96. He opined that Wilson suffered from diabetes, inflammatory arthritis as gout and some disorders of the spine. R. 586. Wilson also had morbid obesity. R. 591. Dr. Karsh agreed with Dr. Barber's functional capacity assessment in Exhibit 12F. R. 586.

The ALJ asked the VE to assume a hypothetical person of Wilson's education and work experience who could lift twenty pounds frequently, sit eight hours and stand and walk four hours in an eight-hour day. R. 599. The VE testified that this person could not perform any of Wilson's past relevant work. *Id.* The VE opined that the hypothetical person could perform light, unskilled jobs of ticket seller, warehouse checker and assembler, small parts, each of which jobs was available in the national economy. R. 599-600. The VE was not asked whether a person with postural or environmental limitations could perform any of these jobs.

## ANALYSIS.

Wilson raises only two assignments of error. First, he contends that the ALJ did not apply the correct legal standards to the opinions of Dr. Barber and Dr. Karsh. Second, he submits that the ALJ did not properly apply the pain standard. I will address these assignments of error in turn.

NOT FOR PUBLICATION

*Opinions of Dr. Barber and Dr. Karsh.*

Wilson contends that there is not substantial evidence in the record to support the ALJ's rejection of the postural and environmental limitations included in Dr. Barber's functional capacity assessment and adopted by Dr. Karsh in his testimony as a medical expert. The ALJ rejected Dr. Barber's opinion as to these limitations because (1) he relied too heavily on Wilson's subjective reports of his symptoms and limitations and (2) the medical records did not support these limitations, citing to a February 2012 report in which Wilson was advised to exercise daily for at least thirty minutes. R. 19.

It is not apparent why the ALJ believed that Dr. Barber relied too heavily on Wilson's reports of his symptoms rather than on findings on examination. It is correct that Wilson told Dr. Barber that he had gout flares during bad weather, which may account for some of the environmental limitations Dr. Barber including in his functional capacity assessment. However, in the reports of his physical examination, Dr. Barber noted that Wilson was unable to squat. R. 462. Dr. Barber also found on physical examination that Wilson had pain on range of motion in his lower extremities, paravertebral muscles spasms with positive point tenderness and a straight-leg raising test was positive for left low back pain. R. 461. Tests of sensory perception revealed numbness and tingling his Wilson's feet, worse on the left than the right. R. 461. These findings on examination support the postural limitations identified by Dr. Barber.

The February 2012 treatment note cited by the ALJ provides little support for the ALJ's decision to discount a portion of Dr. Barber's opinion. The treating physician was addressing Wilson's cardiac and diabetes condition when he recommended a strict diet and thirty minutes of exercise daily. *See* R. 565. There is no evidence that the treating physician was aware of

NOT FOR PUBLICATION

Wilson's disorders of the spine when she designed the exercise program for Wilson. Nor is there any evidence that the thirty minutes of exercise daily would have required postural activities beyond those that Dr. Barber opined that Wilson could perform.

Dr. Karsh's opinion further supports Dr. Barber's conclusions regarding environmental and postural limitations. Dr. Karsh is board certified in internal medicine and rheumatology. SSA regulations indicate that more weight should be given to the opinion of a specialist about a medical issue related to his area of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). The ALJ appears to have rejected a portion of Dr. Karsh's opinion only because "those restrictions are not consistent with the medical evidence of record or supported by the record as a whole." R. 19. Other than the February 2012 treatment note, discussed above, the ALJ does not identify what medical evidence of record was inconsistent with Dr. Karsh's opinion. Notably, Dr. Karsh testified that Wilson had gout in weight bearing joints like the foot and ankle. R. 589. The ALJ did not discuss why pain from gout in weight-bearing joints would be inconsistent with the postural limitations Dr. Karsh adopted.

Counsel for the Commissioner contends that if the ALJ erred in rejecting the postural and environmental limitations identified by Dr. Barber and Dr. Karsh, this error is harmless. Relying on the *Dictionary of Occupational Titles* ("DOT"), they assert that none of the jobs the ALJ identified at step five of the sequential evaluation involve postural activities or environmental factors that are inconsistent with Dr. Barber and Dr. Karsh's functional capacity assessments. Review of the DOT for each job shows that postural activities are not required. Similarly, none of the jobs require work in extreme temperatures, around vibrations or work with moving mechanical parts. DICOT 211.467-010, 1991 WL 671853 (Ticket Seller); DICOT 222.687-010,

NOT FOR PUBLICATION

1991 WL 672130 (Checker I); DICOT 706.684-022, 1991 WL 679050 (Assembler, Small Parts). However, the job of small parts assembler does require work in loud noise, which would be inconsistent with the functional capacity assessments of these physicians. DICOT 706.684-022, 1991 WL 679050 (Assembler, Small Parts). Nevertheless, because there were two jobs available in the national economy that Wilson could perform even if the ALJ had adopted the postural and environmental limitations in the functional capacity assessments, I recommend that the Court find that any error in the treatment of these physicians' functional capacity assessments was harmless. *See, e.g., Turner v. Astrue*, No. 8:08-cv-65-Orl-T-TBM, 2009 WL 804676, at * 7 (M.D. Fla. March 26, 2009).

Therefore, I recommend that the Court find that the first assignment of error is not well taken.

*Pain Standard*.

The pain standard in this circuit requires (1) evidence of an underlying medical condition and either (A) objective medical evidence confirming the severity of the alleged pain arising from that condition or (B) that the objectively determined medical condition is of such severity that it can reasonably be expected to cause the alleged pain. *Foote v. Chater*, 67 F.3d 1553, 1560-61 (11th Cir. 1995) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). Once a claimant establishes through objective medical evidence that an underlying medical condition exists that could reasonably be expected to produce the pain, "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability." *Id.* at

1561. "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62.

In his second assignment of error, Wilson argues that the ALJ did not articulate specific and adequate reasons supported by evidence in the record to support the finding that Wilson's reports of pain and other subjective symptoms were not entirely credible.

The ALJ found that Wilson's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible for the reasons explained in this decision." R. 16. The better practice would be for the ALJ to state the reasons supporting a credibility finding with specificity, rather than requiring counsel and the Court to search for reasons in the decision supporting the finding.

Nevertheless, it appears that the ALJ relied on Wilson's ability to exercise and his activities of daily living as support for the credibility finding. R. 16 ("The claimant testified that he walks, bends, and squats for exercise. The claimant also noted that he is able to do the laundry, prepare simple meals, drive, and shop for groceries."). The ALJ also relied on a treatment note from Dr. Caraballo stating that "opioid analgesics have relieved the claimant's pain and improved daily physical functioning and quality of life. The treatment notes also indicate that the claimant is able to tolerate his current pain reliever and he is not experiencing any side effects form the pain reliever." R. 18.

Counsel for Wilson argues that Wilson did not testify that he walks, bends and squats for exercise. Rather, Wilson averred as follows: "I walk, I try walking. I try bending, squatting, everything to loosen up – [.]" R. 40-41. Wilson also wrote that he could walk to the mailbox and back with pain and use of a cane. R. 380. Wilson testified that he could prepare simple

NOT FOR PUBLICATION

meals, drive and shop for groceries, although he sometimes had to use an electric cart when shopping.  R. 48.  He testified that he could manage to do the laundry if he had to, but it would be difficult.  R. 48.

As for pain relief, the record shows that Wilson was able to tolerate opioid medication without side effects.  The ALJ correctly observed that Dr. Caraballo opined that narcotic pain medication helped improve Wilson's daily functioning.

I recommend that the Court find that the ALJ properly applied the pain standard.  The reasons articulated for finding Wilson's reports of limitations from pain and other subjective symptoms are supported by substantial evidence in the record.  While activities of daily living are generally not dispositive of a claimant's ability to perform substantial gainful activity, SSA regulations require an ALJ to consider daily activities among other evidence in determining the claimant's ability to work.  20 C.F.R. § 404.1529(a); *Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987).

For these reasons, I recommend that the Court find the second assignment of error is also not meritorious.

### RECOMMENDATION.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **AFFIRMED**.  I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

### Notice.

**Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its**

**filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.**

  **Respectfully Recommended** this 10th day of July 2015.

             *Karla R. Spaulding*
             KARLA R. SPAULDING
            UNITED STATES MAGISTRATE JUDGE